J-A03037-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHIKIED DOUGLAS | : | |
| | : | |
| Appellant | : | No. 57 EDA 2025 |

Appeal from the Judgment of Sentence Entered December 9, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000118-2024

BEFORE: BOWES, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED AUGUST 6, 2026**

Appellant, Chikied Douglas, appeals from the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County after a non-jury trial at which the trial court found Appellant guilty of possession of a firearm by a prohibited person, carrying a firearm without a license, carrying a firearm on public streets or public property in Philadelphia, and possession of a prohibited offensive weapon.[1] Appellant presents two claims challenging the denial of his pre-trial suppression motion. After careful review of Appellant's arguments and the Commonwealth's concession, we affirm.

As Appellant's issues only concern the denial of his pre-trial suppression motion, the only facts relevant for our review are contained in the evidence

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 6108, and 908(a), respectively.

presented at the suppression hearing held on July 23, 2024. That evidence included testimony from Police Officers Kevin Tilghman, Antonio Russo, and Eric Schroder, and the officers' related body camera footage.

On November 30, 2023, Officers Tilghman and Russo's tour of duty brought them to the area of the 5700 block of Pine Street in Philadelphia, an area which Officer Tilghman described to the suppression court as a place "known for narcotics and violence." N.T. Suppression Hearing, 7/23/24, 8-10, 34. The officers conducted a car stop at that location because the subject car had a registration that had expired on August 31, 2023. *See id.* at 10, 35. Appellant, who was in the passenger seat, exited the car with a Pampers diaper box in his hand. *See id.* at 10, 12, 38. Officer Tilghman told him to get back into the car and proceeded to conduct the vehicle stop. *See id.* at 10-11. Appellant complied with the officer's request and asked the officer if he could give the diapers box to the mother of his child. *See id.* at 12. Officer Tilghman asked for an address for that woman, but Appellant never gave an exact address. *See id.* at 12.

Officer Tilghman retrieved a driver's license, a vehicle registration, and proof of insurance from the driver of the car while Officer Russo spoke with Appellant for his information. *See* N.T. Suppression Hearing, 7/23/24, 12, 35. Appellant identified himself as "Kashied Douglas" to Officer Russo but a subsequent search for information about that person in mobile databases did not return any records. *Id.* at 12-13. The officers returned to the car and asked Appellant how to spell his name, which he did a couple more times. *See*

*id.* at 13. Officer Tilghman then asked him to step to the rear of the car. *See id.* Appellant gave the officers the same name as before and said, "Yeah, I'm 30, I mean I'm 33." *Id.* at 13. Officer Tilghman asked Appellant if he had a cellular phone with his name on it or a photograph of his identification card and Appellant said no. *See id.* at 13. Believing that Appellant was possibly a wanted person, the officers escorted him to their patrol car. *See id.* at 13.

When the officers tried to put Appellant in the back of their vehicle, Appellant tensed up and said, "Whoa, whoa, whoa." N.T. Suppression Hearing, 7/23/24, 15. The officers then requested backup assistance and waited for the arrival of the backup officers. *See id.* When the additional officers arrived, Officer Tilghman asked Appellant to put his hands behind his back and Appellant refused to comply and tried to slide past the officers, which resulted in an officer using a taser on him. *See id.* at 15-16. The taser only contacted Appellant's backpack. *See* Ex. C-1 at 10:01-10:21. Appellant continued to try to move past the officers and the officers took him to the ground and handcuffed him before putting him in the rear of their police vehicle. *See* N.T. Suppression Hearing, 7/23/24, 16. "At that point, [Officer] Russo was frisking the vehicle" and placed the diaper box on the roof of the stopped car. *Id.* at 16; *see also id.* at 41-42, 51.

The diaper box, which had been opened at some time, was taped shut on the top. *See* N.T. Suppression Hearing, 7/23/24, 41. One of the backup officers, Officer Schroder, went to move the box and informed Officer Tilghman that he felt the handle of a firearm inside the box when he lifted the

box by its cutout handles. *See id.* at 17, 51. The officers were able to see a firearm in the box through the cutout. *See id.* at 16, 50-51; *see, e.g., id.* at 44 (Officer Russo: "When the other officers told me to look inside, I seen the handle of a firearm through the little hole that was in the Pampers box." The Prosecutor: "And by the hole, do you mean the handle?" Officer Russo: "Yes."). Once informed about the firearm, Officer Tilghman alerted Appellant to the presence of the firearm. *See id.*, 17. Appellant said that the firearm was the gun of his child's mother and it was "clean." *Id.* Appellant asked the officers if they could "just give it back" and mentioned that he did not want the mother of his child to get in trouble. *Id.* Officer Tilghman informed Appellant that they could not just give it back and that he was then under arrest. *See id.*

After the discovery of the firearm, Appellant informed the officers about the proper spelling of his name. *See* N.T. Suppression Hearing, 7/23/24, 18, 22. The officers then learned that his birth year was 1991, rather than his claim of 1990. *See id.* at 18. A police database search with Appellant's correct personal information yielded that there was a pending arrest warrant for him for a probation violation on a prior aggravated assault charge. *See id.* at 18-19. The firearm in the diaper box was a black Smith & Wesson gun, loaded with ten live rounds. *See id.* at 39. In addition to the firearm, the diaper box contained silver metal brass knuckles and a red stun gun. *See id.* at 23-25, 39.

Following Appellant's arrest, the pre-trial court held Appellant over for trial on the above-referenced firearms charges and additional charges for possessing an instrument of crime ("PIC") and resisting arrest.[2] **See** Disposition and Dismissal Form, 1/5/24, 1-2. Among his pre-trial motions, Appellant filed an omnibus motion seeking the suppression of physical evidence.[3] **See** Omnibus Motion, 1/24/24, 1-2. At a hearing on the suppression motion, Appellant argued that the police lacked reasonable suspicion for an automobile stop, the police lacked a sufficient basis to conduct a safety frisk or search of the stopped car, and "the search that occurred did

_____

[2] 18 Pa.C.S. §§ 907(a) and 5104. An additional pre-trial charge for false identification to law enforcement was dismissed for lack of evidence. **See** Disposition and Dismissal Form, 1/5/24, 2; 18 Pa.C.S. § 4914(a).

[3] Specifically, Appellant checked various boxes on the omnibus motion form reflecting his contentions that:

(1)   the defendant's arrest was illegal.

    (a)   he was arrested without probable cause.

    (b)   he was subjected to a stop and frisk on less than reasonable suspicion.

    (c)   he was arrested without a lawfully issued warrant or other legal justification

             ***

(3)   the search was without a warrant.

(4)   the search was conducted without probable cause.

Omnibus Motion, 1/24/24, 1.

not comply with the appropriate scope for a safety frisk." N.T. Suppression Hearing, 7/23/24, 5. Appellant argued that he was already arrested for either resisting arrest or disorderly conduct prior to the frisk of the car leading to the discovery of the firearm and that there was no basis for the safety frisk of the car because he would not be returning the car in the presence of the police officers. *See id.* at 54-54. He additionally asserted that the police needed a warrant to remove the diaper box from the car and search it. *See id.* at 61-62. The body camera videos from both Officer Tilghman, Ex. C-2, and Officer Russo, Ex. C-1, were entered into evidence at the suppression hearing. *See id.* at 21-22, 36-42, 53. The suppression court held Appellant's motion under advisement so the parties could file responsive briefs. *See id.* at 62-64.

After Appellant filed a memorandum of law in support of his suppression motion, the suppression court denied the motion on August 26, 2024. *See* Appellant's Memorandum of Law, 8/7/24, 1-7; Order (suppression motion denial), 8/26/24, 1. While the record for this appeal does not contain any notes of testimony for the court listing at which the suppression court denied the motion, the court explains its reasons in its opinion. It notes that it found: (1) there was "reasonable suspicion to suspect criminal activity, which justified the ensuing safety search"; (2) the safety frisk was limited to the area in and around the passenger seat where Appellant was sitting; (3) the search was not overly intrusive as to make the discovery of the firearm violative of Appellant's constitutional rights; (4) there was no manipulation of the box that led to the discovery of the firearm; and (5) the officers were permitted to

remove the firearm from the diaper box under a combination of the plain view and plain feel doctrines in the absence of a search warrant. *See* Suppression Court Opinion, 4/22/25, 7-16. Appellant filed a motion for reconsideration of the court's denial and the trial court denied that reconsideration motion on September 12, 2024. *See* Appellant's Motion for Reconsideration, 8/30/24, 1-7 (unpaginated); Order (reconsideration motion denial), 9/12/24, 1.

Appellant waived his right to a jury and proceeded to be tried by the trial court on October 7, 2024. The Commonwealth agreed that it was no longer pursuing the PIC and resisting arrest charges. *See* N.T. Trial, 10/7/24, 10. The parties stipulated that the trial evidence consisted of the suppression hearing testimony, the footage from Officer Tilghman's body-worn camera, the property receipt for the firearm recovered from the diapers box, photographs of the firearm, a property receipt for the diapers box, photographs of the stun gun and brass knuckles recovered from the box, a certificate of non-licensure for Appellant, a secure court summary for Appellant, and a test fire report concerning the recovered firearm's operability. *See id.* at 10-13. After consideration of the stipulated evidence and the arguments of counsel, the trial court convicted Appellant of the above-referenced firearm and prohibited offensive weapon offenses. *See id.* at 17; Trial Disposition and Dismissal Form, 10/9/24, 1-2. Sentencing was deferred for the preparation of a presentence investigation report and a mental health evaluation. *See* N.T. Trial, 10/7/24, 17.

On December 9, 2024, the trial court sentenced Appellant to an aggregate sentence of eleven and one-half to twenty-three months' imprisonment, to be followed by eight years' probation. *See* Order (sentencing), 12/9/24, 1. Appellant timely appealed. *See* Notice of Appeal, 12/20/24, 1. Appellant and the trial court have satisfied their obligations under Pennsylvania Rule of Appellate Procedure 1925. *See* Order (Rule 1925(b)), 1/10/25, 1; Rule 1925(b) Statement, 1/31/25, 1-2; Suppression Court Opinion, 4/22/25, 1-16.

Appellant presents the following questions for our review:

I.    Did the police conduct an unlawful protective search without reasonable suspicion that there were weapons present, and was the recovery of a gun and other contraband the fruit of that illegal "frisk[?]"

II.   Was a warrant required to open the sealed box, and was the recovery of its contents fruit of an unlawful warrantless search?

Appellant's Brief, 2 (answers omitted; numbering altered).

Appellant's claims challenge the suppression court's rulings. On appeal from an order denying a motion to suppress, we apply the following standard of review:

[We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by those findings and may reverse only if the [suppression] court's

legal conclusions are erroneous. … [T]he suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [suppression court] are subject to our plenary review.

*Commonwealth v. Patterson*, 304 A.3d 1245, 1249 (Pa. Super. 2023) (internal quotation marks and citations omitted). In addition, it "is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Cephus*, 208 A.3d 1096, 1098 (Pa. Super. 2019) (quoting *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006)).

Appellant's first claim challenges the officer's decision to conduct a safety sweep of the front passenger seat of the car. He argues the officers did not have reasonable suspicion to conclude either Appellant was in possession of a weapon or their safety would be threatened. *See* Appellant's Brief, 9-14. He argues further that any police suspicions about a weapon "were rendered irrelevant by circumstances as they had developed" by the time of the search, because "there was no risk that he would return to the car to regain access to any weapons," as, "one way or another, he was being arrested." *Id.*, 17 (emphasis omitted).

In evaluating whether an officer was justified in conducting a protective search of a passenger area of the car for weapons, we employ the standard the Supreme Court of Pennsylvania adopted in *Commonwealth v. Morris*, 644 A.2d 721 (Pa. 1994). Our Supreme Court in *Morris* applied the test set forth in *Michigan v. Long*, 463 U.S. 1032 (1983), and held that the search

- 9 -

of the passenger compartment of an automobile is permissible if a police officer possesses reasonable suspicion that the suspect may gain immediate control of a weapon. *See Morris*, 644 A.2d at 723. In reaching this decision, the Court explained that, since roadside encounters are inherently dangerous, "[o]ur constitutional safeguards do not require an officer to gamble with his life." *Id*., at 724. Thus, "a police officer may conduct a protective weapons sweep of a vehicle where the officer has sufficient facts at his disposal such that a reasonably prudent man would have believed his safety was compromised." *Commonwealth v. Watley*, 153 A.3d 1034, 1045 (Pa. Super. 2016) (citation and internal quotation marks omitted). In evaluating whether the sweep was valid, "we look at the totality of the circumstances facing an officer when we examine whether that officer came to a reasonable suspicion to search for a weapon." *Id.* (citation and internal quotation marks omitted). The question is not whether the officer subjectively feared for his safety, "but the objective reasonableness of the search under the totality of the circumstances." *Id.*

Recognizing that "a police officer may frisk an individual to search for weapons if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," Suppression Court Opinion, 4/22/25, 8 (internal quotation marks and citation omitted), the suppression court ruled that the officers had reasonable suspicion warranting a safety sweep of the passenger area of the car, as follows:

Officer Tilghman testified that officers were trying to determine the identity of Appellant. Appellant repeatedly provided an incorrect spelling of his name, as well as an incorrect date of birth, to officers. Officers then asked Appellant to get out of the car and move to the rear of the patrol car in order to ascertain Appellant's identity. Based on prior experience, Officer Tilghman testified that when he is given false information it is frequently because that person has a warrant or a probation violation. Furthermore, when officers first stopped the vehicle Appellant got out of the vehicle and attempted to distance himself from the box by asking if "he could give the Pamper[s] box to his baby mom." N.T. [Suppression Hearing,] 7/23/24 at 12.

Officer Tilghman stated that he has encountered situations before during traffic stops where an individual has a warrant and is also armed. Specifically, Officer Tilghman testified that he arrested another individual three blocks from the location in the instant matter who "had a bench warrant and incident to arrest he had a firearm on him." N.T. [Suppression Hearing,] 7/23/24 at 23. Upon moving to the patrol car Officer Tilghman testified that Appellant immediately tensed up and refused to enter. Appellant then attempted to evade officers and was tased.

Suppression Court Opinion, 4/22/25, 9.

We agree with the suppression court. Based on the totality of the circumstances, where Appellant disregarded lawful police commands, which disregard rose to a level requiring an officer to attempt to stun him with a taser and several police officers to forcibly take him to the ground and handcuff him, the police were reasonably concerned that if they were to let him return to the stopped car, where a weapon could be, their safety might be at risk. It is well-established that officers may direct the movements of the driver or occupants of a vehicle during a valid traffic stop. ***See Commonwealth v. Wright***, 224 A.3d 1104, 1109 (Pa. Super. 2019). Also, during a lawful stop, an officer may ask the detainee questions to determine

his identity and to obtain information confirming or dispelling the officer's suspicions. *See Commonwealth v. Harris*, 176 A.3d 1009, 1020 (Pa. Super. 2017). Appellant's continuing failures to comply with lawful police directives during a night-time car stop warranted their safety concern.

"The purpose of a *Terry* frisk is to dispel any fear that the stopped suspect is armed and dangerous." *In re T.W.*, 261 A.3d 409, 421 (Pa. 2021). Such a frisk search "does not require the officer to be absolutely certain that the individual is armed." *Id.* (internal quotation marks and citation omitted). In determining whether a frisk was constitutionally valid and supported by reasonable suspicion, a court examines "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Commonwealth v. Taylor*, 771 A.2d 1261, 1269 (Pa. 2001) (quotation marks and citation omitted). Indeed, police may conduct a protective sweep of a car upon seeing a passenger acting fidgety on their approach to the stopped car, and here, Appellant had jumped out of the car holding the pampers box and tried to leave. *See Commonwealth v. Murray*, 936 A.2d 76, 79-80 (Pa. Super. 2007) (police officer "articulated sufficient facts to lead him to properly conclude that Murray could have been armed and dangerous" to justify protective sweep of car during lawful car stop at "9:15 p.m. in a high narcotics area," even though the officer could not "actually see what [Murray] was doing," but was able to discern "a lot of movement in the vehicle"). Thus, given Appellant's persistent, albeit non-violent, resistance to lawful police orders, requiring physical restraint during

a night-time car stop in an area known for violence, the officers were justified in conducting a protective sweep of the passenger area of the stopped car.

The more difficult question is whether there was any chance that Appellant would have been allowed to return to the car and leave the scene. In *Michigan v. Long*, the Supreme Court cautioned that a court should consider the risk that a suspect may "break away from police control and retrieve a weapon from his automobile," as well as the possibility that "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long*, 463 U.S. at 1051–52; *see also Commonwealth v. Arrington*, 233 A.3d 910, 917-18 (Pa. Super. 2020) (concluding that an officer did not have authority to conduct a protective sweep of passenger compartment of car once "Arrington was in handcuffs, positioned at the rear of his vehicle, out of reach of the passenger compartment, and being supervised by [officers]"); *Morris*, 644 A.2d at 724 (emphasizing that a protective sweep is justified where an appellant is not under arrest because he could gain access to a weapon when released). Although we may easily dispense with the possibility that Appellant, while handcuffed, sitting calmly in the back seat of a patrol car, speaking one-to-one with Officer Tilghman, and with several other uniformed police officers between him and the stopped car, might break away from police control, there remains a question of whether Appellant might have been allowed to return to the car after the investigation was completed.

Our review of this question is stymied by Appellant's vague Rule 1925(b) statement. Appellant informed the suppression court only that he was challenging the determination that the officers had "reasonable suspicion justifying a frisk or 'safety search' of the vehicle" and that the frisk "exceeded its permissible scope." Appellant's Rule 1925(b) Statement, 2. The suppression court answered both of these assertions, but not whether Appellant would have been allowed to return to the car but for the discovery of the firearm. *See* Suppression Court Opinion, 4/22/25, 9. It did not address Appellant's present argument that he could not "regain access to any weapons" that might be in the car as "one way or another he was being arrested." Brief for Appellant, 17.

Examining Appellant's argument, we find that it is meritless in the absence of findings of fact by the suppression court in his favor. Appellant relies on cross-examination of Officer Tilghman with regard to his belief that Appellant provided a false name and his intent to obtain Appellant's true name, during which investigation Appellant began to resist. *See* Appellant's Brief, 17-19; N.T. Suppression Hearing, 7/23/24, 27-29. Officer Tilghman agreed that providing false information to a police officer and resisting arrest is a crime, and that Appellant's resistance "was another issue" for himself and his fellow officers. *See* Appellant's Brief, 18; N.T. Suppression Hearing, 7/23/24, 28. Appellant emphasizes the following question and answer from Officer Tilghman's cross-examination in his brief:

Q. By the time the gun was eventually recovered, both of those alleged offenses had already occurred?

A. Yes.

Appellant's Brief, 18; N.T. Suppression Hearing, 7/23/24, 28-29 (emphasis omitted).

Appellant concludes from the cross-examination of Officer Tilghman that the police officers "believed him to have committed at least one misdemeanor offense that would itself have led to an arrest." Appellant's Brief, 19. However, Officer Tilghman did not testify that he would have arrested Appellant for either crime, absent the discovery of the firearm, and Appellant did not ask him that question. Indeed, the officer stated that Appellant was not under arrest when brought to the patrol car and his intent was just "to identify who [Appellant] is." N.T. Suppression Hearing, 7/23/24, 16-17. Thus, to come to the same conclusion as Appellant we would have to infer it from his cross-examination testimony. Our standard of review permits us to consider defense evidence only insofar as it remains uncontradicted by the record as a whole.[4] *See Patterson*, 304 A.3d at 1249. We are not permitted to consider a suppression witness' arguably contradictory testimony from direct- and cross-examination when it runs counter to the suppression court's ruling. *See Commonwealth v. Carter*, 779 A.2d 591, 593 (Pa. Super. 2001) ("Since our

_____

[4] Upon close review of the video from Officer Tilghman's body camera, entered into the record as Exhibit C-2, we discern no support for Appellant's contention that Officer Tilghman had placed him under arrest, or necessarily had determined that he would do so, until he was informed of the firearm discovered in the diaper box.

standard of review requires us to consider only the evidence of Appellee's witnesses and the uncontradicted evidence presented by [Appellant], we are constrained to accept the version of the officer's testimony elicited [by the Appellee] during cross-examination"). Accordingly, we find that Appellant's argument is not supported by testimony that we may properly consider in the absence of the suppression court's findings of fact on point.

The Commonwealth, contrary to its position before the suppression court, now concedes this precise point, stating that "a determination had already been made to take [Appellant] into custody for a criminal offense" before the protective sweep of the passenger area of the car was conducted. Appellee's Brief, 8-9.[5] We note that this is the entirety of the Commonwealth's argument in support of its concession other than a citation to **In re O.J.**, 958 A.2d 561, 566 (Pa. Super. 2008) (*en banc*), for the proposition that a safety sweep is lawful where there is no determination to arrest prior to the sweep.

_____

[5] We understood from the change in the Commonwealth's position that the issue would be clear in the record even without the suppression court's opinion on point. However, we had to twice request the video evidence introduced at the suppression hearing. We first received only Exhibits C-2 and C-3. Recognizing that neither Appellant's argument nor the Commonwealth's concession was supported by either of these exhibits, we again requested all of the video evidence and received, finally, Exhibit C-1. It was Appellant's obligation "to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." **Commonwealth v. Bongiorno**, 905 A.2d 998, 1000 (Pa. Super. 2006) (*en banc*). We decline to find the issue waived for an initially incomplete record because the record on appeal is now complete.

We have a duty to examine, and not just accept, the Commonwealth's concession. *See Commonwealth v. Brown*, 196 A.3d 130, 194 (Pa. 2018) (Dougherty, J., concurring) ("as this case proves, a confession of error by a district attorney, no matter how well intentioned, may in fact be incorrect").[6] Unlike Appellant, however, the Commonwealth relies on the police body camera video evidence to support its assertion:

> As captured on body-worn camera footage that was entered into evidence, the officers can be heard saying: "So at the very least, he's locked up for disorderly conduct" and "a hundred per cent." Exh. C-1, 15:40-46; N.T. [Suppression Hearing, 7/23/24,] 36–37.

Appellee's Brief, 3.

The Commonwealth refrains from naming the officers involved in the conversation, or providing a full context, but after our review of the video from Officer Russo's body camera, we are confident that the highlighted remarks were made by Officer Russo and a patrol sergeant who had arrived on the scene after Appellant was taken to the ground and handcuffed. Officer Russo explained to the sergeant that Appellant provided a "fake name" and described Appellant's resistance to police commands by "turning away" and "pushing" to avoid being handcuffed. *See* Ex. C-1, 15:26-15:46. In response, the sergeant stated, "At the very least [Appellant]'s locked up for disorderly

---

[6] *See also Commonwealth v. Brown*, --- A.3d ---, 2026 WL 1737056, at *1 (Pa., filed June 16, 2026) ("when the prosecutor sides with a defendant, there generally is no adversarial testing of the defendant's entitlement to relief, and the court is left without the benefits of opposing advocacy[,]" nevertheless, "a prosecutor is duty-bound to confess error**,** *provided the facts and law call for it*") (emphasis supplied).

conduct," to which, Officer Russo said, "A hundred percent." **See id.** at 15:40-46. The Commonwealth infers that this statement discloses Officer Russo's intent to arrest Appellant before he conducted the safety sweep. Maybe so, but the Commonwealth offers no reason to select this one brief interchange as the controlling evidence of what a group of officers may have believed, or why it should weigh more in the totality of the circumstances than Officer Tilghman's actions one-on-one with Appellant.

Moreover, the Commonwealth's theory of concession, to the extent that we can infer it, runs contrary to precedent because it relies on Officer Russo's subjective view of the circumstances. "We have defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest." **Commonwealth v. Lovette**, 450 A.2d 975, 978 (Pa. 1982); **see also Commonwealth. v. Rosas**, 875 A.2d 341, 349-350 (Pa. Super. 2005). In general, determining whether an encounter with the police becomes custodial, "[t]he standard … is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized …" and "must be determined with reference to the totality of the circumstances." **Commonwealth v. Pakacki,** 901 A.2d 983, 987 (Pa. 2006) (quoting **Commonwealth v. Edmiston**, 634 A.2d 1078, 1085–86 (Pa. 1993)). Moreover, "an officer's use of handcuffs to detain an individual during an investigative detention for his or her safety does not necessarily escalate the

encounter into a custodial arrest." ***Interest of M.W.***, 194 A.3d 1094, 1099. (Pa. Super. 2018) (concluding that no arrest occurred where the defendant was frisked, handcuffed, and placed in the back of a police cruiser while police investigated if he was driving a stolen vehicle). On the other side of the balance, "merely because a police officer says that an individual is not under arrest is not conclusive on whether an arrest was actually effectuated." ***Rosas***, 875 A.2d at 348.

Here, Appellant was in handcuffs in the back seat of a patrol car, but with the door open, speaking one-on-one with Officer Tilghman, who continued to question Appellant to obtain his true identity. ***See Rosas***, 875 A.2d at 344, 348-349 (reversing suppression order because Rosas was not under arrest, though handcuffed and removed from his car during a lawful traffic stop during which he could provide none of the required documentation, or even a home address, and the information that he did provide raised the possibility that "he may have been a deported felon"). Most importantly, the video evidence supports a conclusion that whatever the meaning of the conversation between Officer Russo and the sergeant, Appellant was not aware of it, as Officer Tilghman blocked his view of the other two officers while he was responding to Officer Tilghman's questions at the same time as the brief conversation took place between Officer Russo and the sergeant. ***See*** Ex. C-1, 15:26-15:46; Ex. C-2, 15:50-17:21. Officer Tilghman was informed about the discovery of the firearm at 18:16 on the video from his body camera. ***See*** Ex. C-2. Under existing precedent, and in the absence of factual

findings on point from the suppression court, Officer Russo's subjective belief, which was not communicated to Appellant, should play no part in the totality of the circumstances test. **See Pakacki,** 901 A.2d at 987. Certainly, neither the Commonwealth nor Appellant, have provided us with a legal theory where Officer Russo's subjective intent would control. Therefore, we cannot agree with the Commonwealth's concession on this record.

We therefore deem the issue of whether Appellant was under arrest prior to the safety sweep waived for purposes of our review because of Appellant's failure to adequately apprise the suppression court in his Rule 1925(b) statement that his appellate suppression claim would challenge whether he would be released and able return to the car upon completion of the investigation or was already under arrest, and thereby deprived us of the suppression court's findings of fact and analysis on this issue that are necessary for us to make a determination. **See Commonwealth v. Tyack**, 128 A.3d 254, 260 (Pa. Super. 2015) (finding waiver of an appellate claim where an appellant's concise statement was too vague to permit review).

We are cognizant that the issue of whether Appellant had been, or inevitably would be, arrested prior to the safety sweep of the passenger compartment of the stopped car, might be considered a subsidiary issue to whether the safety sweep was justified, as under the rule, "[e]ach error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court[.]" Pa.R.A.P. 1925(b)(4)(v). But, it was Appellant's focus on an alleged lack of reasonable suspicion supporting the

safety sweep and on the scope of the sweep as conducted, abandoned in the brief, that misled the suppression court. *See* Appellant's Rule 1925(b) Statement, 2. Moreover, the rule states that "this provision does not in any way limit the obligation of a criminal appellant to delineate clearly the scope of claimed constitutional errors on appeal." Pa.R.A.P. 1925(b)(4)(v). We are therefore forced to conclude that the question of whether Appellant was under arrest prior to the safety sweep of the car was waived by Appellant in his Rule 1925(b) statement.

In his third and final claim, Appellant argues that the police officers were required to obtain a search warrant before opening the "sealed diaper box." Appellant's Brief, 19-20. He argues that, to assert the plain view doctrine as an exception to the warrant requirement, the police had to establish they were in a lawful position to retrieve the items from inside the box. *See id.* at 20. He contends that, "[e]ven if police were able to see the gun, or a portion of it, from outside the diaper box, the inside of that box was in no sense an area 'already fully exposed to public view[,]'" and that "seeing the contents of the package required slicing it open with a box cutter, and led to the discovery of other items inside that police did not realize were there beforehand." *Id.* at 22. He draws the analogy that the handle of the diaper box was like a window in a house, and seeing the gun through the handle on the box did not permit opening the box without a search warrant exactly the same as an officer could not enter a house to retrieve a gun seen through a window. *See id.*, 22-23.

"The plain view doctrine permits the warrantless seizure of an object […] when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." ***Commonwealth v. Collins***, 950 A.2d 1041, 1045 n.4 (Pa. Super. 2008) (*en banc*) (citing ***Commonwealth v. McCree***, 924 A.2d 621, 628-629 (Pa. 2007); ***see also Commonwealth v. Brown***, 23 A.3d 544, 551-52 (Pa. Super. 2011) (*en banc*). "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." ***Harris v. United States***, 390 U.S. 234, 236 (1968) (per curiam); ***see also Commonwealth v. Zhahir***, 751 A.2d 1153, 1160 (Pa. 2000) ("[p]ursuant to the plain view doctrine, when an officer is lawfully in a position to view an item, the incriminating nature of which is immediately apparent, he may legitimately seize that item"). Moreover, "when conducting a lawful search … any contraband found in plain view is subject to seizure." ***Commonwealth v. Bartee***, 868 A.2d 1218, 1221 (Pa. Super. 2005); ***see also Commonwealth v. Turner***, 982 A.2d 90, 92 (Pa. Super. 2009) (officer may seize an "immediately apparent" incriminating object seen in plain view where there was no Fourth Amendment violation in arriving at the place from which the view was plain and has a lawful right of access).

The suppression court explained its ruling as follows:

Here, officers legally stopped the vehicle due to an expired registration and Appellant immediately exited the vehicle and attempted to distance himself from the box. Appellant also

repeatedly gave officers a false name and a false date of birth. After officers initiated a brief detention of Appellant in order to determine his identity, Appellant refused to enter the rear of the [officers'] patrol car and attempted to push past officers. Based upon Appellant's actions and attempts to evade, and Officer Tilghman's experience, police conducted a safety frisk of the passenger side of the vehicle which included the box.

This court found that after the initial stop police conducted a "search of the vehicle, which the police have every right to do given these circumstances, they are looking specifically for any kind of weapon." N.T. [Suppression Hearing,] 8/23/2024 at 7. As officers legally determined the existence of the firearm within the box[,] "[t]he fact [police officers] waited to actually retrieve the gun back at the police station is of no moment to this Court. They are, at that time, … not searching a box. They know there is a gun in the box." N.T. [Suppression Hearing,] 8/23/2024 at 8.

… Notably, when officers seized the firearm, they were not conducting a search to potentially locate a firearm or other contraband within the box. Officers were aware of the firearm in the box based on Officer Schroder feeling the handle [of the firearm] when moving the box. Based on this knowledge of the firearm, and Appellant being prohibited from carrying a firearm, officers had probable cause to open the box and retrieve the firearm.

Suppression Court Opinion, 4/22/25, 11-12.

Based upon our review, we conclude that the record, including the relevant body-worn camera footage of the incident, supports the suppression court's factual findings and legal conclusions. *See Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (we are "bound by the suppression court's factual findings so long as they are supported by the record"). The gun was first felt, then seen in plain view, through the cut-out handle holes of the diaper box by a police officer while moving the box to conduct a lawful safety sweep of the passenger compartment of the car based on reasonable

- 23 -

suspicion. **See** N.T. Suppression Hearing, 7/23/24, 39-42, 44, 50-52. The box was taped closed on the top. **See id.**, 41-42. Upon relaying the information that a gun was found, Appellant provided his correct name to Officer Tilghman, who then determined there was an outstanding arrest warrant for Appellant. **See id.**, 22. We discern no error in the suppression court's ruling.

Appellant argues that a search warrant was required because the inside of the diaper box was not an area exposed to the public. He does not argue that the gun was not seen in plain view through the cut-out handle holes, but that the officers could not access the gun without a search warrant because the diaper box had tape on it keeping the top flaps closed. **See** Appellant's Brief, 22-23. We find this argument unpersuasive. The safety sweep was justified by reasonable suspicion that Appellant could have a gun in the car, and the officer's removal of the diaper box was reasonable so that he could conduct the sweep, and therefore the officer was lawfully in position to perceive the firearm. Nevertheless, under **Commonwealth v. Saunders**, 326 A.3d 888 (Pa. 2024), where, as here, police officers conduct a traffic stop with no prior awareness that the car contained evidence of a crime, then they are entitled to seize contraband, the gun here inside a diaper box, when they see it in plain view, without first obtaining a search warrant. **Id.**, 905-906.

Appellant's attempt to equate a cardboard diaper box with tape on top to a home, and the box's cut-out handles to a window in a home also fails.[7]

_____

[7] It also is the same failed analogy raised by the dissent in **Saunders**. **See** 326 A.3d at 920 n.16 (Donohue J., dissenting).

Simply stated, Appellant could not have held the same expectation of privacy in the diaper box that he would have had in a home. *See id.* at 906 n.13 ("our Court has previously stated that the expectation of privacy people possess in an automobile is not identical to that which they possess with respect to the interior of their home"); *see also Collins*, 950 A.2d at 1046 n.4 (the limited automobile exception under the Pennsylvania Constitution, which was reapplied in *Saunders*, allows an officer a right to seize an object seen in plain view in a car because there is a "lack of notice [the object would be present] coupled with the significantly diminished expectation of privacy in a vehicle"). Here, the cut-out handle of the box is, unlike a window in a home, intended to be used by putting one's fingers through it to carry the box. When he did so, Officer Schroder "felt the handle of a firearm," which he immediately recognized, and confirmed by looking through the same hole. N.T. Suppression Hearing, 723/24, 51. At that point, the officers could have seized the firearm from the diaper box under the plain view doctrine. That an officer also found additional weapons when the box was opened later also falls within the plain view doctrine. *See Turner*, 982 A.2d at 92; *Bartee*, 868 A.2d at 1221. Accordingly, we affirm the order denying suppression and the judgment of sentence.

Judgment of sentence affirmed.

Judge McLaughlin joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/6/2026</u>